# In the United States Court of Federal Claims

**BID PROTEST**

(Filed: December 13, 2023)

<span style="color:red">**Redacted Version**</span>

|  |  |  |
|---|---|---|
| **LIFE SCIENCE LOGISTICS, LLC,** | ) | Case No. ___23-2116 C___ |
| *Plaintiff,* | ) | |
| v. | ) | Judge _____ |
| **THE UNITED STATES,** | ) | |
| *Defendant.* | ) | |

**PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER, DECLARATORY JUDGMENT,
AND PRELIMINARY INJUNCTION**

Jennifer S. Zucker
   *Counsel of Record*
Christopher M. O'Brien
Eleanor Ross
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Tel: (202) 331-3114
Fax: (202) 331-3101
zuckerjs@gtlaw.com

*Counsel for Life Science Logistics, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

QUESTION PRESENTED .................................................................................................. 3

STATEMENT OF THE CASE............................................................................................. 4

    I.      LSL Has Long and Effectively Managed the Strategic National Stockpile
          for the Critical NCR. ................................................................................... 4

    II.     GSA Seeks to Pretermit Further Protests by Overriding the Automatic
          CICA Stay. ............................................................................................... 10

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ...................................................................................................................... 15

    I.      GSA's Stay Override Was Arbitrary and Capricious and Therefore
          Invalid. ..................................................................................................... 17

          A.      No Significant Adverse Consequences Will Occur In the Absence
                 of an Override. ............................................................................ 18

          B.      Reasonable Alternatives Exist to a CICA Override ................................ 20

          C.      Cost-Benefit Analysis .............................................................. 23

          D.      Impact of Override on Competition and the Integrity of the
                 Procurement System .................................................................. 25

    II.     LSL's Irreparable Harm, the Balance of Equities, and the Public Interest
          Support Temporary or Preliminary Injunctive Relief. .............................. 27

          A.      LSL Is Suffering and Will Continue to Suffer Irreparable Harm
                 from the Stay Override .............................................................. 27

          B.      The Balance of Hardships and the Public Interest Support
                 Injunctive Relief. ....................................................................... 29

CONCLUSION.................................................................................................................... 31

i

# TABLE OF AUTHORITIES

**Cases**

*Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006) .......................................... 20

*Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009) ..................................................... 29

*Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) ....................................................................................................................................... passim

*Alion Sci. & Tech. Corp. v. United States*, 69 Fed. Cl. 14, 17 (2005) ........................................ 13

*Am. Signature, v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) ....................................... 31

*American Petroleum Institute v. EPA*,  216 F.3d 50, 58 (D.C. Cir. 2000)................................... 21

*AT&T Corp. v. United States*, 133 Fed. Cl. 550, 555–56 (2017)..................................... 14, 20, 26

*Bus. Roundtable v. SEC*, 647 F.3d 1144, 1154 (D.C. Cir. 2011)................................................. 20

*Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 111 (2004)................................... 30

*Chapman L. Firm Co. v. United States*, 65 Fed. Cl. 422, 424 (2005) ......................................... 14

*Contracting Consulting Eng'g LLC v. United States*, 103 Fed. Cl. 706, 709 (2012) .................. 15

*CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 751 (2021) ...................................... 30

*Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019)......................................................... 18

*Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)................................... 30

*Intelligent Waves, LLC v. United States*, 137 Fed. Cl. 623, 625 (2018) ..................... 13, 19, 20, 21

*Mangi Envtl. Grp. Inc. v. United States*, 47 Fed. Cl. 10, 19–20 (2000) ..................................... 31

*Mgmt. & Training Corp. v. United States*, 161 Fed. Cl. 578, 617 (2022) ................................... 28

*Michael Stapleton Assocs., Ltd v. United States*, 163 Fed. Cl. 297, 350–51 (2022) .................. 28

*Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 723 (D.C. Cir. 2016)........................................... 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) .............. 13

*MTB Group, Inc. v. United States.*, 65 Fed. Cl. 516, 532 (2005) ............................................... 31

*Palantir USG, Inc. v. United States*, 904 F.3d 980, 994 (Fed. Cir. 2018) ............................ 13, 18

*PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) ........................................................ 29

*Progressive Indus., Inc. v. United States*, 129 Fed. Cl. 457, 485 (2016)................................... 28

*RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999)............. 12, 13

*Reilly's Wholesale Prod. v. United States*, 73 Fed. Cl. 705 (2006) ...................................... passim

*SAI Industries Corp. v. United States*, 60 Fed. Cl. 731 (2004)................................................... 28

*Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006), *aff'd*, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006) ......................................................................................... 29

*Serco, Inc. v. United States*, 101 Fed. Cl. 717, 720 (2011)....................................................... 15

*Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 154 (2010) .................................................. 30

*Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 190 (2007)..................................... 19

*Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 397 (2013) ........................... 14

*Technica LLC v. United States*, 142 Fed. Cl. 149, 154 (2019) .................................. 14, 19, 21, 25

*URS Fed. Servs. v. United States*, 102 Fed. Cl. 674, 676 (2012).......................................... 28, 31


**Statutes**

28 U.S.C. § 1491.............................................................................................................. 12, 13

28 U.S.C. § 1491(b)(2) ............................................................................................................. 1

31 U.S.C. § 3553............................................................................................................... passim

5 U.S.C. § 706......................................................................................................................... 13

**Other Authorities**

ASPR, Strategic National Stockpile, https://aspr.hhs.gov/SNS/Pages/default.aspx (last accessed Dec. 11, 2023) .................................................................................................................. 4

**Rules**

Rule 65 of the Rules of the United States Court of Federal Claims ................................... 1, 12, 15

**Government Accountability Office**

*Life Science Logistics, LLC*, B-421018.2, B-421018.3, Apr. 19, 2023, 2023 WL 3226204, 2023 CPD ¶ 103 ................................................................................................................... 8

Pursuant to 28 U.S.C. § 1491(b)(2) and Rule 65 of the Rules of the United States Court of Federal Claims, Plaintiff Life Science Logistics, LLC ("LSL") moves for a temporary restraining order, declaratory judgment, and preliminary injunction prohibiting Defendant, the United States of America, acting by and through the General Services Administration ("GSA"), Federal Systems Integration and Management Center ("FEDSIM"), from unlawfully proceeding with the performance of an improper contract in the amount of $237,823,262.00 awarded to Integrated Quality Solutions, LLC ("IQS") under Solicitation No. 47QFCA22R0020 (the "Solicitation" or "RFP").  GSA has decided to override the automatic stay of performance under the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d), that was triggered when LSL filed a protest at the United States Government Accountability Office ("GAO") on November 20, 2023, challenging GSA's award decision.

## INTRODUCTION

The GSA, acting on behalf of a component of the Department of Health and Human Services, has three times solicited bids for a new long-term contract for the Strategic National Stockpile ("SNS") warehouse that serves the National Capital Region ("NCR"), including Washington, D.C., New York, Philadelphia, and Baltimore.[1]  GSA has twice been obligated to take corrective action and amend and re-bid the solicitation in response to errors identified in protests by the incumbent contractor, LSL.  The third time, despite a third protest by LSL, GSA overrode the automatic stay that presumptively forbids the government from taking action under a

---

[1] GSA administers the procurement on behalf of SNS.  The contracting officer for this procurement, and for all other SNS support contracts, is a GSA employee.  Accordingly, throughout this brief, LSL refers to GSA and SNS collectively as "GSA" or the "Agency" because the entities are inextricably intertwined.

contract that is the subject of a pending bid protest before the Government Accountability Office ("GAO").

GSA's determination and findings in support of the override reveal that the third solicitation suffered from the same pervasive flaws that doomed the first and second. The override neither reflected a compelling case that the third protest would be rejected, nor that exceptional circumstances merited immediate performance of a potentially flawed contract. Rather, the decision appears to reflect the agency's impatience with the procedural safeguards Congress imposed in the CICA.

The national security and emergency preparedness functions served by the SNS are undoubtedly weighty. There is no question that true exigency could justify the award of a stockpile contract other than through the ideal process of competitive bidding. In that situation, it would be understandable if the government were to turn to a large, experienced contractor, even at a price premium, to meet the needs of the moment. But that is not what happened here. Instead, the situation is practically the opposite: no persuasive exigency exists, but only a manufactured urgency created by the government. The bidder favored by the government is ████ ████████████████████████████████████████████ ███████████████████████████████████████████. And the bid the government has repeatedly sought to accept is not cheaper, but $██████ more expensive than the alternative offered by LSL.

The purported exigency has inexplicably been created by the government's decision to relocate the emergency medical supplies in the NCR stockpile into other regions around the country. This has, unfortunately, eroded the undeniable competitive benefits of LSL's incumbency. As a result, the stockpile is less prepared to respond to a public health emergency in

several of the Nation's largest population centers.    And that reduced readiness, which the government engineered, is now the government's principal justification for overriding the automatic stay, which Congress created to protect the integrity of the contracting process.    But even if reversing the government's willful depletion of the stockpile in the NCR were a basis to override the stay, in this case the override will do no such thing, because the warehouse proposed by IQS, the government's favored bidder, will not be ready until months after the GAO decides the pending protest.

Moreover, to address any concern about the lack of a stockpile facility in the NCR, LSL has offered the government the continued use of its incumbent facility, which has successfully fulfilled this mission for more than a decade.    Yet the government refuses to extend the bridge contract it issued during the Covid-19 pandemic, even though that refusal leaves the NCR without a stockpile facility.

The weighty government interests at stake are all the more reason to insist that this contract be awarded through a transparent, accountable, and fair process, so that the competing bidders and the public can trust the propriety of the award.    Given the absence of exceptional circumstances, this Court can and should allow the congressionally designed normal course of this procurement to proceed, and restore the automatic stay during the pendency of LSL's GAO protest.    In that regard, the preponderance of the evidence demonstrates that LSL will be irreparably harmed by IQS commencing performance and this Court should therefore issue a temporary restraining order pending the resolution of this matter on the merits.

## QUESTION PRESENTED

I.    Whether GSA's override of the CICA stay in response to LSL's third GAO post-award bid protest, after the first two forced GSA to take corrective action, was arbitrary and

3

capricious in violation of the Administrative Procedure Act and therefore entitles LSL to declaratory and injunctive relief.

**STATEMENT OF THE CASE**

**I.      LSL Has Long and Effectively Managed the Strategic National Stockpile for the Critical NCR.**

The SNS is a nationwide network of facilities for the storage and deployment of medicines, vaccines, and medical supplies managed by the Administration for Strategic Preparedness and Response ("ASPR") within the Department of Health and Human Services. *See* Ex. 1 at 2–3. The purpose of the SNS is to supplement the resources of local governments and medical facilities and provide "a short-term, stopgap buffer when the immediate supply of these materials may not be available or sufficient." ASPR, Strategic National Stockpile, https://aspr.hhs.gov/SNS/Pages/default.aspx (last accessed Dec. 11, 2023). The SNS maintains ███████████ worth of product across █ facilities, each specifically chosen to ensure that necessary supplies can be quickly deployed in a time of crisis. *See* Ex. 1 at 2–3.

Since 2011, LSL has served as the contractor for the SNS warehouse servicing the NCR, a geographic region that includes the Washington, D.C., New York, Philadelphia, and Baltimore metro areas. Ex. 13 at 1, ¶ 4. At a warehouse it manages in Baltimore, Maryland, LSL has for over a decade safely and securely maintained, managed, and deployed an array of pharmaceuticals, medical supplies, medical equipment, and emergency supplies. *See* Ex. 1 at 2–3. LSL's incumbent site manages up to ████ pallets of product, including DEA-regulated, temperature-controlled-ambient, cooler, frozen, and ultra-low temperature ("ULT"). Ex. 13 at 1, ¶ 6; *see generally* Ex. 1.

LSL has excelled under even the most trying circumstances. Over the course of its ten-year contract and a currently effective bridge contract, LSL has met the needs and expectations of the SNS through the COVID-19 pandemic as well as multiple disease outbreaks, hurricanes and

4

other natural disasters, migrant and refugee crises, and other public health emergencies requiring mobilization of the SNS. *See* Ex. 3 at 2, 6, 11. In the face of these demands, ████████

████████████████████████████████████████████████████

███████████████████████████████████████████. *See generally*, Ex. 3.

LSL's long-term contract expired in July 2021. Ex. 1 at 4. At this time, GSA had not awarded a follow-on contract to support the Northeast Corridor. *See id.* Accordingly, on August 30, 2021, GSA issued Bridge Contract No. 47QFCA21C0020 (the "Bridge Contract") for LSL to continue providing the same services in the same facility through December 25, 2023, with the option for GSA to further extend that the term through at least January 25, 2024. *Id.*

Shortly after the execution of the Bridge Contract two years ago, SNS wrote to LSL:

> I would like to thank the larger team, not only for [SURGE activities the weekend of August 20, 2021], but for their professionalism and attention to details over the last 18 months responding to real-world events, such as COVID-19, Hurricanes, Afghanistan Intake Mission, the United Nations General Assembly Mission, etc. As you're aware, this type of performance is a true reflection of leadership, detailed training, and personal accountability.

Ex. 4. LSL has offered to extend the Bridge Contract, and remains willing to do so, but the government has refused. Ex. 13 at 2, ¶ 8.

### A. GSA's Attempts to Award a New Contract for the NCR Have Been Repeatedly Vacated Under Protest

Nearly a year after issuing the Bridge Contract, on May 19, 2022, GSA issued Solicitation No. 47QFCA22R0020 for a new, 10-year contract (including options) to manage the SNS for the NCR. Ex. 5 (the "Initial Solicitation"). The Initial Solicitation called for the same managed services as the incumbent contract but a ████████ inventory requirement of ████ pallet positions. Ex. 5 at 14. It also included a requirement for two ULT walk-in freezers. *Id.* at 33.

As is standard in procurements seeking a contractor to meet the unique needs of the contracting agency, the Initial Solicitation acknowledged that any proposed site will require "conditioning," which is the process of renovating or building the proposed warehouse to meet SNS's needs, including conditioning for ambient and cold chain product, walk-in ultra-low temperature freezers, obtaining various local permits, state and federal licenses, upgrades to the facility's electrical systems, installing security systems and equipment, installing HVAC and temperature monitoring equipment, installing racking, obtaining material handling equipment (forklifts), building drive-in freezers and coolers, furniture, dry ice machines, and other equipment. *See* Ex. 5 at 17–18, 20, 27, 127; *see also* Ex. 2 at 18–20; Ex. 13 at 2, ¶ 10.  The Conditioning Phase must be completed before product can be moved into the facility.  *See* Ex. 5 at 18 ("In accordance with the Conditioning Phase, for which acceptance has been authorized, the contractor shall execute the Product Movement phase of the Transition-In Plan NLT one calendar day after facility acceptance...."); Ex. 2 at 20 ("Upon receipt of conditioning acceptance by the Government, the contractor shall commence Product Movement phase of the Transition-In Plan NLT the next calendar day").  The Initial Solicitation contemplated an aggressive conditioning phase:

> The Conditioning Phase shall not exceed 180 days; 120 days is preferred for ambient storage. The Government is willing to consider Transition-In Plans that require extended timelines (greater than 180 days) for complexities such as new building construction, build out of walk-in chambers, and parallel conditioning if a second site is proposed.

Ex. 5 at 127; *see also* Ex. 2 at 20.

Only two offerors submitted proposals in response to the Initial Solicitation: LSL and Integrated Quality Solutions ("IQS").  Ex. 6 at 3.  LSL has supported the SNS for over 16 years on multiple sites and, having created and refined the operational standard operating procedures around SNS requirements, LSL has unique insights into the complexity of the program.  Further,

████████████████████████████████
████████████████████

█████████████████████████████████████. IQS, on the

other hand, ████████████████████████████████████

████████████████████████████████████████

██████████████████████████. *See* Ex. 7 at 29–32; Ex. 13 at 2, ¶ 10.

### B. First Award Decision and Protest

On August 16, 2022, GSA awarded the contract to IQS. Ex. 6 at 3. LSL timely filed a post-award protest with the GAO on August 30, 2022. Ex. 7. This protest triggered an automatic stay under the CICA, meaning no further action on the procurement or performance under the contract could be undertaken until GAO adjudicated the protest. 31 U.S.C. § 3553(d)(2), (4). GSA did not override the stay or even suggest that there would be any credible basis for doing so.

Among other challenges to the award, LSL noted that ████████████████



█████. *Id.* at 23–24; *see also* Ex. 5 at 28. Specifically, ██████████████

██████████████████. Ex. 7 at 23–24. LSL also protested that ███████████

███████████████████. *Id.* at 28–33.

On September 13, 2022, GSA filed a notice of corrective action, advising that it would "amend the solicitation to account for the issues identified in the areas of ████████████ ████████, request new proposals, conduct new evaluations and make an award." Ex. 8. Thereafter, GSA terminated the award to IQS, issued an amended solicitation that ████████

▮▮▮▮▮▮▮▮▮▮, requested new proposals, and conducted another evaluation of proposals from IQS and LSL. *See* Ex. 2 (the "Amended Solicitation").

## C. Second Award Decision and Protest

On December 22, 2022, GSA announced that it had again awarded the contract to IQS and that the agency's assessment of LSL's proposal had been downgraded from "Good" to "Not Acceptable." Ex. 9 at 3–4. GSA inexplicably downgraded LSL's proposal under the Amended Solicitation, despite there being no change in the relevant requirements or LSL's qualifications. See Ex. 2; Ex. 9; *see also* Ex. 10. Indeed, the only thing that effectively changed between LSL's first and second proposals was LSL's filing of the successful protest of the first award to IQS.

On January 10, 2023 LSL timely filed a second protest at GAO, once again triggering an automatic CICA stay. Ex. 10. Among other challenges to the second award, LSL protested that GSA had inexplicably removed all five technical "strengths" it had assigned to LSL's proposal in the first evaluation, despite there being no intervening changes to the relevant requirements. *See id.* at 14–15. In addition, GSA assigned LSL's proposal multiple "weaknesses" and "significant weaknesses," based on features of LSL's proposal that were unchanged between the first and second submissions, without once raising its newfound concerns during discussions with LSL. *Id.* at 39–40.

On April 19, 2023, GAO sustained LSL's second protest on grounds that GSA failed to conduct meaningful discussion as part of its previous corrective action, in particular by failing to disclose alleged flaws first identified during GSA's evaluation of LSL's materially unchanged second proposal. *See Life Science Logistics, LLC*, B-421018.2, B-421018.3, Apr. 19, 2023, 2023 WL 3226204, 2023 CPD ¶ 103. GAO recommended that GSA "reopen the procurement and conduct appropriate and meaningful discussions with LSL and IQS, request and evaluate revised

8

proposals, and make a new source selection decision." *Id.* at 8. GAO also recommended that LSL be reimbursed for its costs of filing and pursuing the protest. *Id.*

### D. GSA's Actions After the Sustained Second Protest and Third Award Decision

On May 11, 2023, GSA issued a corrective action notice and requested from LSL and IQS updated transition-in plans and master schedules (Gantt charts). Ex. 11. GSA also notified LSL and IQS that it would be conducting new site visits, entering into discussions with offerors, and requesting final revised proposals. *Id.* GSA later advised that site visits would occur in June or July 2023; that updated transition-in plans and schedules were due August 15, 2023; and that discussions and submission of final revised proposals would occur after August 15, 2023. *See* Ex. 12 at 1–3.

Also on May 11, 2023, the same day that it issued the corrective action notice, and without any prior notice or explanation to LSL, SNS began moving product out of the NCR site to LSL sites in other regions. See Ex. 13 at 1, ¶ 7. As a result, the NCR stockpile is now empty, and any deployment of SNS product in the NCR will have to come from other SNS regions. The agency took these unexplained steps even though the Bridge Contract remained in effect and final revised proposals for the follow-on site were not due for several months. *Compare* Ex. 13 at 1, ¶ 7 *with* Ex. 11 at 1–2.

On June 20, 2023 and September 27, 2023, LSL offered SNS to extend the Bridge Contract past January 25, 2024. Ex. 13 at 2, ¶ 8. On both occasions, LSL specifically offered to work with SNS to execute an equitable bridge contract. *Id.* In the September 27, 2023, meeting LSL specifically explained that it would do everything possible to help SNS avoid interruption in service. *Id.* SNS declined both offers. *Id.*

9

████████████████████████████████████
████████████████████

Thereafter, GSA conducted discussions with LSL and IQS and requested revised proposals by July 28, 2023. *See* Ex. 14. On July 18 and July 25, 2023, LSL submitted questions to GSA regarding LSL's discussions, and expressed concern that several of GSA's discussion questions suggested that GSA was relying on unstated evaluation criteria or changed requirements, and that they ignored information in LSL's updated proposal. *See* Exs. 15, 16. Despite requesting revised proposals, GSA did not terminate IQS's award and continued to move product out of the incumbent site. *See* Ex. 17; Ex. 13 at 1, ¶ 7; Ex. 1 at 8.

### E. Third Award Decision and GAO Protest

On October 30, 2023, GSA announced that it had awarded the contract to IQS for the third time. Ex. 18 at 3. Following debriefing, LSL submitted a timely third protest to GAO on November 20, 2023, again triggering the automatic CICA stay. Ex. 19. Two weeks after LSL's protest was filed, on December 7, 2023, GSA notified GAO that it intended to override the CICA stay based on "urgent and compelling" circumstances and the best interests of the Government. Ex. 1. The same day, GSA issued LSL a ████████████████████████ CPARS rating for all categories on which the NCR facility was assessed. Ex. 3 at 1–4.

### II. GSA Seeks to Pretermit Further Protests by Overriding the Automatic CICA Stay.

GSA's Determination and Findings ("D&F") for the CICA override states that it was prepared and controlled by the contracting officer. *See* Ex. 1 at 1, 11.

The D&F concludes that "[a]llowing IQS to begin performance of the contract is in the best interests of the United States because it avoids an impending interruption in coverage that would degrade the nation's health security readiness posture in the region, in contravention of the SNS' mission." *Id.* However, despite reaching this conclusion, the D&F ignores that GSA had been moving product out of the NCR since May 2023, meaning that it was the GSA's unilateral action—not LSL's protest—that created an interruption in coverage. *See id.* Indeed, LSL's offer

10

to extend the Bridge Contract was rebuffed by the government, even though a short-term extension would prevent any interruption in coverage while the GAO protest is resolved. *See* Ex. 13 at 2, ¶ 8.

The D&F further asserts that "[s]ignificant adverse consequences to the United States will occur if the stay is not overridden" because "GAO's decision in the current protest is not due until February 28, 2023, resulting, at a minimum, in nearly five weeks without coverage" and supplies will need to be shipped in from other sites should an emergency occur. Ex. 1 at 6. Again, however, the D&F does not mention that product will have to be shipped in from other states regardless of whether the CICA stay is overridden because SNS itself spent millions of dollars to move the product out of the NCR. *See generally* Ex. 1; Ex. 13 at 2, ¶ 9. It also does not state that the conditioning period for the new site for cold-chain product is approximately 180 days (6 months) under the best of circumstances ████████████████████████████████, from the date GSA issues a notice to proceed, and longer for the ULT systems, which is significantly longer than the 100-day timeline for a GAO decision. *See* Ex. 1; Ex. 13 at 4, ¶ 16. In other words, SNS created the conditions it now complains of, and its proposed solution is, at best, 180 days away from the first date that critical product can be delivered to the new site.

The D&F further claims there is no reasonable alternative because the incumbent site, which has served the NCR successfully for the past 12 years through COVID-19 and countless other events, is ████████████████████████████. *Id.* at 7. It also claims that the SNS's new requirement calls for ████████████████████████ ████████████. *Id.* at 7–8. The D&F fails to reconcile the contention regarding the viability of the incumbent site with SNS's use of the incumbent site beyond expiration of the original

contract or with SNS's continued grading of the incumbent site as meeting or exceeding all requirements. *See* Ex. 1 at 7–8; Ex. 3 at 1–9.

The D&F further claims that bringing a different facility online within a reasonable time is not feasible because of SNS's requirements and the typical conditioning timeline that can take up to 180 days. *See* Ex. 1 at 9.

The D&F argues that the potential costs of the override are not outweighed by the benefits, based on an estimate of ████████ for IQS's termination costs and the ████████ in legal fees from LSL's sustained GAO protest. *Id.* at 9–10.

Finally, the D&F claims that the override "will promote the integrity of the procurement system" because LSL is a large business and IQS is a small business, and the override "promotes small business participation in the SNS effort" even though none of the SNS procurements are set aside for small businesses. *Id.* at 10–11.

## STANDARD OF REVIEW

This Court has jurisdiction to hear "an action by an interested party objecting to … any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Challenges to alleged violations of the CICA automatic stay provision are within this jurisdiction. *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999). The Court may award "any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2); *see* RCFC 65.

### A.    Review of a CICA Stay Override

CICA provides for a mandatory automatic stay of performance of a contract where a bidder has submitted a protest to GAO within ten days of a contract award or five days of a debrief. 31 U.S.C. § 3553 (d)(2), (4). The contracting agency may override this automatic stay only "upon a

12

written finding that—(I) performance of the contract is in the best interests of the United States; or (II) urgent and compelling circumstances that significantly affect the interest of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. §3553(d)(3)(C); *Intelligent Waves, LLC v. United States*, 137 Fed. Cl. 623, 625 (2018). The automatic stay should be overridden only "in extraordinary circumstances." *Alion Sci. & Tech. Corp. v. United States*, 69 Fed. Cl. 14, 17 (2005).

This Court reviews an agency's decision to override the CICA automatic stay in accordance with the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706, and will overturn an override decision that is arbitrary, capricious, or contrary to law. 28 U.S.C. § 1491(b)(4); *see RAMCOR*, 185 F.3d at 1290. "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Palantir USG, Inc. v. United States*, 904 F.3d 980, 994 (Fed. Cir. 2018) (quoting *State Farm*, 463 U.S. at 43).

In determining whether a CICA override was arbitrary and capricious, this Court has sometimes looked to the four-factor *Reilly's Wholesale* test, which "do[es] not . . . bind the Claims Court" but can be a "useful analytical tool for the Court in reviewing whether the override was arbitrary and capricious." *AT&T Corp. v. United States*, 133 Fed. Cl. 550, 555–56 (2017) (citing

13

*Reilly's Wholesale Prod. v. United States*, 73 Fed. Cl. 705 (2006)). Consideration of the *Reilly's Wholesale* factors is especially "logical" where, as here, the agency itself relied on those factors to reach its override decision. *See Technica LLC v. United States*, 142 Fed. Cl. 149, 154 (2019). The *Reilly's Wholesale* test asks (i) whether significant adverse consequences will necessarily occur if the stay is not overridden; (ii) whether reasonable alternatives to the override exist that would adequately address the circumstances presented; (iii) how the potential cost of proceeding with the override, including the costs associated with the potential that GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs; and (iv) the impact of the override on competition and the integrity of the procurement system, as reflected in the Competition in Contracting Act. *Reilly's Wholesale*, 73 Fed. Cl. at 711.

**B.      The Court's Remedial Authority**

When an agency wrongfully overrides the CICA automatic stay, the prevailing remedy in this Court is the issuance of a declaratory judgment declaring the override unlawful and thus reimposing the stay. *See Technica*, 142 Fed. Cl. at 156. "Declaratory relief is particularly appropriate in bid protest actions contesting agency stay override determinations entered pursuant to 31 U.S.C. § 3553(d)(3)(C)." *Chapman L. Firm Co. v. United States*, 65 Fed. Cl. 422, 424 (2005). Typically, it is not necessary for the Court to enjoin the agency because "[i]f … the agency override determination is … determined to lack validity" under the Administrative Procedure Act, then the "declaratory relief [] ruling serves to reinstate the statutory stay of contract performance, during the GAO protest period." *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 397 (2013). Indeed, "the injunctive relief factors need not be invoked when a bid protest is timely filed with the GAO," so "allow[ing] an arbitrary override to insert the injunctive relief requirements into the process would convert the CICA stay to something other than what Congress created." *Id.*

Holding a bidder to the preliminary injunction standard would, in other words, reward the contracting agency for wrongfully overriding the CICA stay.

Although less common, this Court has also granted relief and reinstated the CICA stay through the issuance of a preliminary injunction, rather than a declaratory judgment. *See, e.g., Reilly's Wholesale*, 73 Fed. Cl. at 709. In determining whether a preliminary injunction is warranted, this Court weighs four factors: "(1) the likelihood of success on the merits, (2) the prospect of irreparable harm to plaintiff in the absence of injunctive relief, (3) the balance of hardships, and (4) the public interest." *Serco, Inc. v. United States*, 101 Fed. Cl. 717, 720 (2011). The standard of proof required for a preliminary injunction or temporary restraining order is a preponderance of the evidence. *Contracting Consulting Eng'g LLC v. United States*, 103 Fed. Cl. 706, 709 (2012). As such, "[n]o single factor is determinative, and 'the weakness of the showing regarding one factor may be overborne by the strength of the others.'" *Comprehensive Health Servs., LLC v. United States*, 151 Fed. Cl. at 206 (quoting *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993)).

Finally, this Court also has authority to enter a temporary restraining order, with or without notice to the agency, to preserve the Court's ability to provide effective longer-term relief during the pendency of the stay override litigation. *See* RCFC 65(b). The standard of review and standard of proof for granting a temporary restraining order are the same as those for a preliminary injunction. *Serco*, 101 Fed. Cl. at 720.

## ARGUMENT

GSA's override decision was arbitrary and capricious under a traditional APA analysis or such an analysis supplemented by application of the *Reilly's Wholesale* factors: the decision relied on facts that are not germane to the decision to override the stay, ignores factors critically relevant

15

to the agency's decision and stated goal, and drew implausible conclusions from the uncontested facts.

*First*, GSA claims that immediate performance is necessary to prevent degrading the security and readiness posture of the NCR. However, that risk did not prevent GSA from moving product out of the legacy site, creating by the agency's own unilateral actions the precise conditions GSA claims it must override the stay to avoid.

*Second*, even if IQS begins performance now, product cannot be moved into the facility until the relevant conditioning is complete, which will take between three and twelve plus months depending on the particular storage requirements (e.g., controlled ambient, ULT, and so forth). Thus, far from preventing the NCR from lacking nearby access to critical products, the override decision *guarantees* it.

*Third*, GSA there are two readily available alternatives: (i) allowing LSL to continue servicing the NCR at the incumbent site pending a decision on LSL's protest; or (ii) continuing to draw on other sites as GSA has been doing since May 2023. LSL has successfully performed SNS's requirements for the past 12 years, earning consistently excellent reviews during perhaps the most demanding period in the SNS's history.

*Fourth*, GSA failed to consider the true costs of the override against the purported benefits. In particular, GSA ignored significant costs of long-lead items and the facility lease that it will incur by allowing IQS to begin performance; costs potentially in excess of $▮▮▮▮▮, that it will be forced to pay should LSL's protest be successful and IQS's contract accordingly terminated. Ex. 13 at 4, ¶ 17. These are costs that will not be offset by any benefit because GSA already moved all product out of the NCR and IQS cannot stand up a new facility until the conditioning period is complete.

*Finally*, GSA entirely omitted consideration of the effect of the override on the integrity of the procurement system, which is significant in light of LSL's two successful prior protests. GSA's override would compromise the few procurement integrity safeguards and is especially concerning where there are only a handful of contractors in the competitive marketplace for the solicited services.

Because GSA's stay override failed to consider important aspects of the problem and contradicted the information before the agency, the decision was arbitrary and capricious. *See Alabama Aircraft*, 586 F.3d at 1375. Accordingly, the Court should enter declaratory judgment or, in the alternative, a preliminary injunction, holding that the stay override is invalid because it violates the APA. The Court should also enter a temporary restraining order to protect its ability to afford effective relief. In addition to LSL's success on the merits, which is established by GSA's violation of the APA, LSL is already suffering irreparable harm from the stay override because IQS is able to jumpstart its facility conditioning, which provides an unparalleled competitive advantage under the Solicitation's evaluation criteria. This, combined with IQS entering into a lease, would as a practical matter make the award of the contract to IQS all but certain. Moreover, the balance of hardships and public interest favor entry of temporary or preliminary injunctive relief. In light of these circumstances, the Court should enter a temporary restraining order enjoining the improper CICA override pending resolution of this matter on the merits.

## I.  GSA's Stay Override Was Arbitrary and Capricious and Therefore Invalid.

GSA relied on the *Reilly's Wholesale* factors in asserting that the best interests of the government and urgent and compelling circumstances warranted overriding the CICA automatic stay. This conclusion cannot withstand even casual scrutiny. While attempting to justify its decision under the *Reilly's Wholesale* factors, the agency failed to consider important aspects of the problem and drew conclusions that contradicted the evidence. *See Alabama Aircraft*, 586 F.3d

17

at 1375; *see also Palantir*, 904 F.3d at 994 (agency action is arbitrary and capricious if there is no "rational connection between the facts found and the choice made"). Each of these failures independently renders the override arbitrary and capricious and therefore invalid.

### A. No Significant Adverse Consequences Will Occur In the Absence of an Override.

GSA first concluded that "[s]ignificant adverse consequences to the United States and the public will occur if the stay is not overridden" because the current Bridge Contract is set to expire before GAO is expected to issue its decision, meaning the NCR will go "nearly five weeks without coverage." Ex. 1 at 5–6. But even if the Bridge Contract expires—despite the built-in extension option in the Bridge Contract and LSL's offer to keep extending it on terms favorable to the government—the CICA automatic stay will not cause any significant adverse consequences because of factors that GSA failed to consider. That "fail[ure] to consider an important aspect of the problem" renders the stay override arbitrary and capricious under the APA, *see Alabama Aircraft*, 586 F.3d at 1375, and means GSA failed under the first *Reilly's Wholesale* factor.

*First*, GSA failed to consider that GSA had already, unilaterally created the conditions that resulted in a potential lapse of coverage in the NCR months before LSL filed its third bid protest. Without explanation, GSA began moving product out of the NCR to other regions in May 2023 and has continued relocating product to such an extent that the NCR has not had effective SNS coverage for months. Ex. 13 at 1, ¶ 7. It is, in other words, entirely due to GSA's own, expensive decision that "deployments of life-saving drugs, vaccines, and other stockpile supplies" *already* "have to be shipped in from outside the region," a *status quo* that has "introduce[d] additional delays, costs, and logistical complexities." Ex. 1 at 6; *see Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) ("[W]e cannot ignore the disconnect between the decision made and the explanation given."). Yet GSA failed to consider whether there was any causal link between the

18

CICA stay and the harm that supposedly justified overriding it. *See Reilly's Wholesale*, 73 Fed. Cl. at 711 (requiring the agency to consider "whether significant adverse consequences will *necessarily* occur if the stay is not overridden" (emphasis added)); *see also, e.g., Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 190 (2007) (D&F must explain why adverse consequences could be avoided "only through" an override).

*Second*, GSA also failed to acknowledge that even with the stay override, the lengthy conditioning phase of the IQS contract means that the NCR will remain exposed for months longer, again because of GSA's own actions. *See Technica*, 142 Fed. Cl. at 154 (arbitrary and capricious to override stay where new contractor's performance would not be "sufficiently superior" to incumbent's). Under even the most optimistic timeline, IQS will not complete the conditioning phase until May 2024. *See* Ex. 13 at 2, ¶ 10. Consequently, as compared to an extension of the Bridge Contract, GSA's stay override will result in a longer period in which the NCR is not covered. In fact, in the stay override decision itself GSA asserts that "the specific SNS requirements necessitate extensive post-award build-out and conditioning activities during the first year of the contract," such that bringing a different facility online is not a reasonable alternative to overriding the stay. Ex. 1 at 9; *see also infra* Section I.B (discussing GSA's failure to consider reasonable alternatives). In other words, GSA asserts both that it is not feasible to stand up a new facility as an alternative to overriding the stay, and that the override is necessary to allow IQS to stand up a new facility. GSA does not even attempt to resolve the conflict between those claims, nor could it.

The automatic stay did not cause the "significant adverse consequences" GSA identified, nor will the override mitigate those consequences. *C.f. Intelligent Waves, LLC v. United States*, 137 Fed. Cl. 623, 627 (2018) ("Defendant did not show a direct connection between any possible

delay in performance of the new task order and a harm that will necessarily affect veterans adversely."). Because GSA failed to consider whether its removal of product from the NCR and IQS's substantial conditioning period eliminate "the need for, and hence the benefit to be had from" a stay override, *see Bus. Roundtable v. SEC*, 647 F.3d 1144, 1154 (D.C. Cir. 2011), its decision is arbitrary and capricious.

**B.    Reasonable Alternatives Exist to a CICA Override**

The Agency's consideration of the next *Reilly's Wholesale* factor—the availability of reasonable alternative to an override—further points in favor of LSL. This factor requires the contracting agency to conclude that "*no* other reasonable alternatives exist," and not simply that an override is marginally preferable. *See AT&T*, 133 Fed. Cl. at 557 (emphasis in original). GSA's determination that there was no reasonable alternative to the override is contradicted by the evidence, providing a second reason that the stay override was arbitrary and capricious in violation of the APA, and fails to satisfy the second *Reilly's Wholesale* factor. *Alabama Aircraft*, 586 F.3d at 1375 (agency action is arbitrary and capricious if the agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency").

GSA asserts that overriding the stay is its only option because the incumbent site is ▮▮▮▮▮▮ and does not meet certain technical requirements in the Initial and Amended Solicitations. Ex. 1 at 7–8. But "it will almost always be the expectation that the new contract will be an improvement over the old," and so "[t]o allow a best interests determination to rest on such a common ground would permit the override exception to swallow the Congressionally mandated rule that stays be automatic." *Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 31 (2006); *see also Intelligent Waves*, 137 Fed. Cl. at 626 ("[a]n assertion that a new contract is in essence better than a current one is not sufficient to show 'best interests.'"). Of course, the IQS facility also does not meet the technical requirements of the solicitations, since it does not even

20

exist yet. *See supra* Statement of Case § I.B (discussing GSA's failure to consider that the lengthy conditioning phase would result in a gap in NCR coverage notwithstanding the stay override).

GSA thus failed to meaningfully consider the most obvious reasonable alternative of all: an extension of the Bridge Contract with LSL. *See Technica*, 142 Fed. Cl. at 155 (agency must consider whether modification or adjustment to existing contract would be a reasonable alternative). GSA ignored this possibility even though the Bridge Contract has a built-in extension option through at least January 2024 and LSL has already offered a further extension on terms favorable to the government. *See supra* Statement of the Case at I.D; Ex. 13 at 2, ¶ 8; Ex. 1 at 4 ("Bridge Contract No. 47QFCA21C0020 . . . can be extended to January 25, 2024"). GSA's unexplained reasons—if it has any—for preferring to override the stay do not suffice to rule out this reasonable alternative solution. *See Intelligent Waves*, 137 Fed. Cl. at 628 ("To allow an override based merely on the fact that to work towards a bridge contract, or to have acted timely and negotiated an extension are more difficult to accomplish than continuing to have the incumbent perform the new contract, would allow agency manipulation of a congressional mandate."); *see also American Petroleum Institute v. EPA*, 216 F.3d 50, 58 (D.C. Cir. 2000) ("[B]ecause the agency has failed to provide a rational explanation for its decision, we hold the decision to be arbitrary and capricious.").

It is also evident that the incumbent site can still support the NCR just as it has done for the past 12 years. GSA recognized this when the initial contract expired in 2021, and GSA issued the Bridge Contract rather than immediately seeking a new vendor. *See* Ex. 1 at 4. Further, LSL's successful performance under the incumbent contract and Bridge Contract has spanned an historic global pandemic and numerous other public health and humanitarian events. *See generally* Ex. 3. In the face of these exceptional challenges, LSL's CPARS review during this time—including one

issued the day after GSA issued the override decision—██████████████
██████████████. *Id.* GSA cannot support its contracting officer's conclusory assumption that the incumbent site is not up to the task, when LSL's performance over the years, under great stress, and of late all prove the opposite.

The only alternative GSA meaningfully considered, and rejected, was "patching together coverage" from other regions as an alternative to overriding the stay. *See* Ex. 1 at 8–9. This is a false dilemma, and as just explained, ignores the easier and much more effective option of continuing to operate under the Bridge Contract. But this is effectively the *status quo*, as a result of GSA's decision to begin moving product out of the incumbent site in May 2023. No product remains in the NCR currently, *see* Ex. 1 at 8, meaning that GSA has for months already chosen to patch together coverage from other regions. Even with the stay override, GSA will have to continue using this alternative until a new facility is conditioned, which will take months. GSA's conclusion that the approach *it is currently using* is not a viable alternative to overriding the CICA stay is unsupportable.

The agency claims that overriding the CICA stay will minimize movements of product because it will allow IQS to begin conditioning work on its facility, so that "at least some of the inventory can move directly to that facility in the "January or early February time frame." Ex. 1 at 8. Yet when LSL proposed to complete the conditioning necessary for ambient-temperature storage within 120 days, GSA assigned LSL a significant weakness in its review for proposing a timeline that was not "believable." Ex. 18 at 14. GSA now justifies the stay override by claiming that IQS can begin moving product into a new facility in less than half that time—by "January or early February." Ex. 1 at 8. That claim contradicts the available evidence and GSA's own considered prior judgment, without explanation. How can a 120-day conditioning period be

22

deemed not credible when proposed by the incumbent contractor—which admittedly has more experience and resources—but a conservative estimate for IQS?

Finally, as explained above, GSA rejects the possibility of an extension of the bridge contract to sustain the NCR until the contract is finally awarded, on the grounds that a new facility cannot be brought online within a reasonable time. Ex. 1 at 9. This may be true, but it directly contradicts GSA's wishful assumption that IQS can bring a new facility online quickly enough to justify the CICA override.

GSA's failure to consider the reasonable alternatives to the stay override is an independent reason the override was arbitrary and capricious.

## C.    Cost-Benefit Analysis

GSA next purported to consider whether the potential costs of overriding the stay were greater than its potential benefits, but failed to consider several significant costs and similarly failed to identify any benefits of the override. The agency's failure to rationally weigh these costs and benefits is another independent basis for finding the override fails the APA's arbitrary and capricious standard, and fails the third Reilly's Wholesale factor. *See, e.g., Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 723 (D.C. Cir. 2016) (arbitrary-and-capricious standard requires agencies to appropriately "weigh the costs of its action against its benefits").

And of course, GSA still fails to reckon with the significant costs of its own programmatic decisions that depleted the NCR's strategic stockpile months ago, and its procurement failures that necessitated the series of protests and corrective actions culminating in this litigation. Indeed, the cost of transporting product from the legacy site to other facilities, standing alone, was approximately ███████. *See* Ex. 13 at 2, ¶ 9. This same cost can be expected when returning product to the NCR.

23

GSA vastly underestimated the potential costs of proceeding with the override.  In that regard, GSA recites that "the Government can expect to pay IQS an estimated $██████ in termination costs" and LSL "██████ in legal fees and costs" if LSL's protest were sustained. Ex. 1 at 9–10.  GSA provides no explanation of how it arrived at the estimated ██ million termination costs figure.  *See id.* at 9–10.  The early termination of a five-year commercial lease with a total 5-year value in excess of $██████—which is a contractual prerequisite for IQS to begin conditioning its facility—could easily exceed GSA's $█ million estimated termination cost on its own.  *See* Ex. 13 at 4, ¶¶ 13–14.  Further, if IQS begins performance now—as it is free to do with the stay overridden—one of the first things it will do is order long-lead items that will have significant cancellation charges.  *Id.* at 2–3, ¶¶ 11–12.  The estimated costs for long-lead-time items for a facility with the requisite size and characteristics to perform this contract are approximately $██████.  *Id.* at 3, ¶ 12.  Even consideration of just these two factors—the costs of canceling a commercial lease (approximately $██████) and orders for long-lead equipment— have not been taken into account in analyzing the override and together total approximately $██ ████ in costs.  *See* Ex. 1 at 9–10.  GSA also did not adequately address, both in the override decision and in the contract award, that LSL's proposal is $██████ cheaper than IQS's.  *See generally* Exs. 1, 18.

Conversely, as discussed above, GSA obtains no real benefits by overriding the CICA stay: the product GSA already moved out of the NCR will still need to be moved back in an emergency, and IQS's facility will still not be online until the conditioning phase is complete, long after the 100-day deadline for GAO's decision is past.  *See* Ex. 1 at 9–10.

**D.    Impact of Override on Competition and the Integrity of the Procurement System**

The final factor GSA claimed supported the override was the impact of the override on competition and the integrity of the procurement system.  At the outset, having identified the integrity of the procurement system as a relevant factor in its analysis, GSA "entirely failed to consider" that factor, *see Alabama Aircraft*, 586 F.3d at 1375, and that failure alone is enough to make the decision arbitrary and capricious under the APA, as well as inadequate under Reilly's Wholesale factor four.  But further, the override would have significant adverse effects on both competition and the integrity of the procurement system.  Now, in response to LSL's third protest, GSA unduly compromises the protest process by overriding the CICA stay, harming LSL and advantaging GSA's preferred contractor ahead of a likely *fourth* attempt at awarding this contract.

The GSA decision notes that "the competitive pool of actual or potential offerors for [NCR] is currently limited to LSL and IQS" and asserts that "[w]hile the market conditions have not allowed the program to set aside any of its procurements for small businesses, allowing IQS to perform the contract will have the additional benefit of promoting small business participation in the SNS effort." Ex. 1 at 11.  The entirety of GSA's analysis under this factor revolves around LSL's status as a large business, IQS's status as a small business, and the offeror's respective shares of SNS contracts. *See* Ex. 1 at 10–11.  None of these considerations, however, can properly support the CICA override decision.

GSA claims that both LSL and IQS incurred significant extra costs due to the repeated successful protests, but ignores that these protests were valid.  GSA cannot fairly justify nullifying the only "teeth" of a GAO protest on the basis that the beneficiary of its procurement errors, IQS, is now burdened by those errors being corrected. *See Technica LLC v. United States*, 142 Fed. Cl. 149, 155–56 (2019) ("If this Court were to allow the Agency override to stand, it would ultimately

be pulling the CICA teeth from the GAO, rendering it a government body with a bark but no ability to bite. This is not what Congress intended.").

GSA has for months been tailoring the bidding process to its predisposition towards IQS, and now relies on the results of that process to support the CICA override. In response to LSL's first protest, which argued that ████████████████████████████████████████ ████████████████████████████████████████, GSA ████████████████████ ████████████████████████. And despite having first evaluated LSL's proposal as "Good," GSA's reevaluation inexplicably found LSL to be "Unacceptable," resulting in a second award to IQS. In response to GAO sustaining LSL's second protest, GSA immediately began moving product out of the incumbent site and refused LSL's offer to extend the performance period of that site, despite indicating that it did not plan to make a new award decision for several months. *See* Ex. 13 at 2, ¶ 8. Now, GSA alleges that the lack of product in the region constitutes an "urgent and compelling" circumstance justifying an override of the CICA stay of IQS's third award.

Considering the success of LSL's two prior protests and GSA's questionable actions, allowing GSA to override the CICA stay will harm the competitive process by limiting the effectiveness of LSL's protest and GAO's ability to promote the integrity of the procurement system. Indeed, from GSA's actions after the second protest—immediately beginning to remove product from the NCR on the same day it announced the scope of its corrective action—it appears GSA has reached a conclusion as to the result of a process that is not properly completed. *C.f. Reilly's Wholesale*, 73 Fed. Cl. at 715 ("[I]t appears that, from the start, the result of the interim procurement was preordained ...."); *AT&T Corp. v. United States*, 133 Fed. Cl. 550, 557 (2017) ("By refusing to respect the CICA stay, the Agency has put itself in a primed position to, at a later point in the protest process, argue that it would be unfairly burdened if the award to CDW-G were

26

set aside, because Census would be forced to replicate months' worth of work that had already been completed.").

At bottom, the override would improperly and unfairly terminate the contracting process in favor of the government's preferred firm. For all these reasons, the stay override violates the APA, and this Court should enter a declaratory judgment invalidating GSA's decision to override the CICA stay to preserve the integrity of the competitive process.

## II.   LSL's Irreparable Harm, the Balance of Equities, and the Public Interest Support Temporary or Preliminary Injunctive Relief.

As demonstrated above, the stay override was arbitrary and capricious, and the Court should award declaratory judgment in favor of LSL. Nothing more is required for the issuance of a declaratory judgment than a determination that the agency override lacks validity under the APA, as established here. Accordingly, the Court should declare the override unlawful, thus reimposing the stay. Nonetheless, if the Court were instead to conclude that the appropriate remedy is not a declaratory judgment but rather a preliminary injunction, that standard is met here as well, and the Court should grant a preliminary injunction as an alternative to immediate declaratory relief. In addition to LSL's likelihood of success on the merits, which is established by GSA's violation of the APA, all of the additional equitable factors—the prospect of irreparable harm to plaintiff in the absence of injunctive relief; the balance of hardships, and the public interest—weigh in favor of awarding LSL injunctive relief as well. For the same reasons, the Court should also enter a temporary restraining order as soon as this matter may be heard to preserve the Court's ability to provide effective longer-term relief during pendency of the stay override litigation.

### A.   LSL Is Suffering and Will Continue to Suffer Irreparable Harm from the Stay Override.

In the absence of immediate injunctive relief, LSL will suffer imminent and irreparable competitive injury, making the re-award of the contract to IQS a *fait accompli*. With the stay

27

overridden, IQS is free to begin performing the contract by entering a costly commercial lease and placing orders for "long-lead" equipment. Those initial steps, which will require committing ███ ████████ of the contract funds, will cement an unearned competitive advantage for IQS and will diminish LSL's price advantage. Ex. 13 at 4, ¶¶ 16–17. This is the precise harm the CICA automatic stay is intended to prevent, *see URS Fed. Servs. v. United States*, 102 Fed. Cl. 674, 676 (2012) ("By enacting the CICA, Congress made clear that it viewed the competitive harm imposed by an override to be severe; hence, the imposition of the automatic stay as a 'strong enforcement mechanism.'"), and is precisely the type of injury this Court and others have found to be irreparable. *See e.g., SAI Industries Corp. v. United States*, 60 Fed. Cl. 731 (2004).

LSL also stands to lose its valuable business managing the SNS for the NCR, which again is a form of harm that courts have readily found to be irreparable. *See Michael Stapleton Assocs., Ltd v. United States*, 163 Fed. Cl. 297, 350–51 (2022) (collecting cases). LSL would lose profits and work experience from the transition to IQS as a result of the stay override, even if LSL's third GAO protest is sustained and the contract is eventually awarded to LSL. Further, given its status at the incumbent contractor, LSL faces a particular risk of harm occasioned by the lost opportunity to compete and the lost profits of the contract. *See Mgmt. & Training Corp. v. United States*, 161 Fed. Cl. 578, 617 (2022) ("[A]s the incumbent contractor, MTC presumably submitted a proposal with the expectation of making a profit (as opposed to submitting a lower-priced offer to gain a toehold in the industry), and there can be no dispute that a lost opportunity to compete for a contract forecloses a contractor's ability to gain the experience associated with performing the contract, which has value when competing in future procurements."); *Progressive Indus., Inc. v. United States*, 129 Fed. Cl. 457, 485 (2016) ("Progressive is the incumbent contractor and the loss of the opportunity to supply even one of the VISNs will cause Progressive to suffer economic harm.").

28

Finally, LSL will be irreparably harmed by the loss of a valuable procedural right that will be extinguished once GAO issues its final decision. CICA grants LSL the right to an automatic stay absent extraordinary circumstances that are not present here. Depriving LSL of this statutory entitlement would be irreparable harm, because "[o]nce the statutory entitlement has been lost, it cannot be recaptured." *Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006), *aff'd*, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006). Once GAO issues its decision in February 2024, LSL will no longer be entitled to an automatic stay—either the protest will be sustained and corrective action taken, or the protest will be rejected. Thus, LSL's right to the CICA stay is valuable but also fleeting, and will be entirely denied absent immediate injunctive or declaratory relief.

Consequently, this factor weighs heavily in favor of granting a temporary restraining order and preliminary injunction.

## B. The Balance of Hardships and the Public Interest Support Injunctive Relief.

The final two factors relevant to injunctive relief—the balance of the equities and the public interest—also tip in favor of LSL.

In weighing the competing hardships, "[t]he court must balance the harm plaintiff would suffer without preliminary relief against the harm that preliminary relief would inflict on defendant." *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009). Even still, Courts have long recognized that any harm to the Government and awardee caused by a delay in performance is less significant than the protester's harm if the protest is sustained. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003). Here, LSL would suffer considerably greater harm without preliminary relief than GSA or IQS would suffer.

As detailed above, LSL would be irreparably harmed by losing the effectiveness of its GAO protest, being placed at a considerable competitive disadvantage by IQS's jumpstart on

conditioning its new facility, and the lost opportunity to compete fairly in this procurement. It would also suffer substantial financial harm, which the Court may consider in balancing the equities. *See CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 751 (2021).

GSA, on the other hand, will not suffer any harm. GSA has already moved product out of the incumbent site, meaning any degradation of security and readiness is self-inflicted and should not be considered. *See Reilly's Wholesale*, 73 Fed. Cl. at 715 (recognizing balance of hardships weighs in favor of plaintiff where, among other reasons, government created any delay resulting from injunctive relief); *see also Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 154 (2010) (same). As the lack of SNS product in the NCR is the *status quo*, the delay in standing up a new site while LSL's protest is resolved will not result in further harm; rather, it would deepen that supposed harm by shutting out the one contractor presently capable of servicing the NCR. *C.f. Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("No harm will inure to third parties since it is undisputed that the government has alternative contractual vehicles available through which it can continue to obtain the needed services uninterrupted."). With respect to IQS's harm, GSA asserts that it ███████████████████████ ████████████████ Ex. 1 at 11. However, GSA does not point to any affidavit or declaration supporting such a claim. *See generally* Ex. 1. Moreover, a "beneficiary of a CICA violation … suffers no harm when the violation is corrected." *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 111 (2004). And even if the protest were overruled and IQS is ultimately awarded the contract, the only disadvantage IQS will suffer is the short delay that CICA expressly and presumptively deems a worthwhile trade-off for a robust and fair procurement process. If IQS is awarded the contract, it will still receive the full term of the contract it bid for, and it will experience only the brief delay that it knew going into this procurement was possible.

Accordingly, the balance of hardships weighs in LSL's favor.

Injunctive relief is also in the public interest because affording such relief will preserve the integrity of the procurement system and GAO's review process. It is well settled that "[t]he public interest is served by ensuring that governmental bodies comply with the law." *Am. Signature, v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Specifically in the context of government contracting, "Congress has determined that the public interest is served by the imposition of an automatic stay to allow the GAO an opportunity to ascertain the merits of a bid protest." *URS Federal Servs., Inc. v. United States*, 102 Fed. Cl. 674, 677 (2012). Whatever interest the government might have in awarding this contract quickly, this cannot come at the expense of providing a fair and level playing field for all competitors in the federal marketplace, and preserving the integrity of the public procurement process. *Mangi Envtl. Grp. Inc. v. United States*, 47 Fed. Cl. 10, 19–20 (2000); *see also, MTB Group, Inc. v. United States.*, 65 Fed. Cl. 516, 532 (2005) ("It is in the public interest for the government to conduct fair procurement procedures, and to give honest and fair consideration to all bids.") (internal citations omitted).

The override decision failed to consider the integrity of the procurement system, and instead discusses only the comparative features of LSL and IQS and the two companies' relative sizes. This is a *non sequitur*—the contract was solicited under full and open competition. Accordingly, the public interest will be best served by observing CICA's statutory mandate and allowing LSL's GAO protest to be decided on the merits.

## CONCLUSION

It is clear, by a preponderance of the evidence, that a temporary restraining order is necessary and appropriate to avoid further irreparable harm to LSL pending a resolution of this action. The Court should also issue a declaratory judgment stating that GSA's decision to override

the CICA stay was arbitrary and capricious, an abuse of discretion, and contrary to law, and that the override was therefore invalid and the stay remains in effect. If the Court concludes that the appropriate remedy is a preliminary injunction rather than a declaratory judgment, the Court should enjoin the stay override based on LSL's success on the merits of its APA claim, the irreparable harm to LSL, the balance of hardships, and the public interest.

Dated: December 13, 2023

Respectfully submitted,

Jennifer S. Zucker
  *Counsel of Record*
Christopher M. O'Brien
Eleanor Ross
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Tel: (202) 331-3114
Fax: (202) 331-3101
zuckerjs@gtlaw.com

*Counsel for Life Science Logistics, LLC*

32